AO 106 (Rev. 01/09) Application for a Search Warrant

# United States District Court
### for the
### Western District of New York

In the Matter of the Search of  Premises Located at:
*(Briefly describe the property to be searched or identify the person by name and address.)*

**25 Avery Avenue**
**Lackawanna, New York  14218**

Case No. 19-mj-1019
**(Filed Under Seal)**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A, which is attached hereto and incorporated by reference herein,**

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized)*:
**Evidence, contraband, fruits, and instrumentalities pertaining to violations of Title 18, United States Code, Sections 2320, 542, and 545, as more fully set forth in Attachment B, which is attached hereto and incorporated by reference herein.**

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 18, United States Code, Sections 2320, 542, and 545.

The application is based on these facts:
- ☒ continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

WILLIAM AIELLO
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS
*Printed name and title*

Sworn to before me and signed in my presence.
Date:   March  *18* , 2019

_____
*Judge's signature*

HONORABLE JEREMIAH J. McCARTHY
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

City and state:  Buffalo, New York

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

STATE OF NEW YORK  )
COUNTY OF ERIE      )    SS:
CITY OF BUFFALO    )

I, William Aiello, a Special Agent (SA) with Homeland Security Investigations (HSI), being duly sworn, depose and state as follows:

## INTRODUCTION

1.    I am a Special Agent with The Department of Homeland Security (DHS), Homeland Security Investigations (HSI), in Buffalo, New York, and have been employed in this capacity for nearly 8 years. I was previously employed as a United States Postal Inspector with the United States Postal Inspection Service (USPIS) for nearly 4 years. Before I began my career as a Postal Inspector and Special Agent, I was employed as a Police Officer with the Henrico County Police Department in Richmond, Virginia. In my capacity as a federal agent, I have investigated criminal violations relating to commercial fraud and intellectual property rights in violation of Title 18, United States Code, Sections 2320, 542 and 545.

2.    This affidavit is submitted in support of an application for a warrant to search 25 Avery Avenue, Lackawanna, NY 14218, hereafter referred to as the "SUBJECT PREMISES", more fully described in Attachment "A", for evidence of violations of Title 18, United States Code, Section 2320, Trafficking in Counterfeit Goods or Services; Title 18, United States Code, Section 542, Entry of Goods by Means of False Statement; and Title 18,

United States Code, Section 545, Smuggling Goods into the United States. The items to be seized are more fully described in Attachment "B".

3.     I am familiar with the information contained in this affidavit based upon my participation in the investigation, my review of documents obtained as part of this investigation, information provided to me by other law enforcement officers, and information provided to me by industry experts. Because this affidavit is submitted for the limited purpose of securing a search warrant, it does not contain all the information which I have learned during the course of this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Sections 2320, 542 and 545 are presently located at the SUBJECT PREMISES.

## STATUTORY AUTHORITY

4.     Based on the facts set forth in this affidavit, I respectfully submit there is probable cause to believe that there is presently concealed, in the SUBJECT PREMISES, the items described in Attachment B hereto, all of which constitutes evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 542 (Entry of goods by means of false statement); Title 18, United States Code, Section 545 (Smuggling goods into the United States); and Title 18, United States Code, Section 2320 (trafficking in counterfeit goods).

(A)     Title 18, United States Code, Section 542 provides: Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any

2

false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties, [is guilty of a crime].

(B)     Title 18, United States Code, Section 545 provides: Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, [is guilty of a crime].

(C)     Title 18, United States Code, Section 2320(a)(1) provides: whoever intentionally traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services . . . or attempts or conspires to [do so is guilty of a crime].

(D)     **<u>Authorization to Inspect Arriving Shipments Seized by U.S. Customs and Border Protection</u>**

19 C.F.R. 162.6, Search of persons, baggage and merchandise provides that:

All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer. Port directors and special agents in charge are authorized to cause inspection, examination, and search to be made under section 467, Tariff Act of 1930, as amended (19 U.S.C. 1467), of persons, baggage, or merchandise, even though such persons, baggage, or merchandise were inspected, examined, searched, or taken on board the vessel at another port or place in the United States or the Virgin Islands, if such action is deemed necessary or appropriate.

3

## TRADEMARK COUNTERFEITING

5.     This investigation involves matters of counterfeiting.  For purposes of this affidavit, the term "counterfeiting" applies solely to the infringement of a trademark.  A counterfeit is a spurious (i.e., false, non-genuine) trademark which, among other things, is identical to, or substantially indistinguishable from, a federally registered U.S. trademark. *See* 18 U.S.C. §2320(f)(1)(A).


6.     For purposes of this affidavit, a "trademark" is any word, name, symbol or device, or any combination thereof, used to identify and distinguish a person or company's goods, including a unique product, from those manufactured or sold by others, and to indicate the source of the goods.  A trademark is registered with the United States Patent and Trademark Office (hereinafter, "USPTO").  Enforcement of trademarks is limited only to those items that are "registered" with the USPTO.


7.     It is a crime for anyone to intentionally traffic or attempt to traffic in counterfeit goods, knowing that a counterfeit mark is used on or in connection with such goods. *See* 18 U.S.C. §2320(a).  A "counterfeit mark" means, among other things, a spurious mark used in connection with trafficking in goods, that is identical with, or substantially indistinguishable from, a mark registered for those goods with the USPTO.  To qualify as a "counterfeit mark," the mark must also be in use (whether or not the trafficker knows the mark is registered) and the use of such mark must be likely to deceive or to cause confusion or mistake. *See* 18 U.S.C. §2320(f)(1)(A).  "Traffic" means to transport, transfer or otherwise dispose of, to another, for

4

anything of value, or to obtain control of with intent to so transport, transfer or dispose of. *See* 18 U.S.C. § 2320(f)(5).

## OVERVIEW OF THE INVESTIGATION

8.     On December 31, 2018, United States Customs and Border Protection (CBP) officers located at the DHL Hub in Rochester, New York, inspected and subsequently seized a DHL Express Worldwide shipment, consigned to Patrick GIBBONS at the SUBJECT PREMISES.   The shipment was sent from a person located in Shenzhen, China. Examination revealed the package contained thirteen pairs of sneakers.   There were 12 pairs of Nike Air Jordan sneakers and 1 pair of non-Air Jordan Nike sneakers.   The sneakers were individually wrapped in plastic bags.   Also found in the shipment were unbranded boxes shipped alongside the sneakers. Examination of the sneakers was completed by CBP Officers who were trained by Nike representatives on how to identify counterfeit Nike products. Based on the packaging, the poor stitch quality and excessive glue around the sole, the sneakers were determined to be counterfeit.

9.     The package was manifested as "men's PVC sneakers" with a declared total value of $130, or $10 per pair of sneakers.   The true MSRP for these sneakers, as determined by a Nike representative, is $140 for three of the shoe styles found in the shipment, and $90 for the other shoe style.   The difference between the manifested $10 per pair versus the actual MSRP indicates knowledge of the fact that GIBBONS was ordering counterfeit sneakers. Therefore, the shipping manifest contained a false declaration pertaining to the shipment of

5

Nike sneakers.   CBP officially seized the package on January 12, 2019 and started administrative forfeiture proceedings.

10.     Photographic samples of the sneakers were provided to a representative of the Nike trademark holder, Nike, Inc.  The company representative verified the sneakers to be counterfeit.  The representative cited the following reasons for his conclusion that the sneakers are counterfeit:

- The product and color code is not valid;
- The "Jordan" logo on the tongue does not meet Nike design standards;
- The UPC on the tongue/size label is not valid;
- The serial number on the tongue/size label is not valid

11.     On January 18, 2019, the CBP Fines, Penalties and Forfeiture (FPF) Office sent a seizure notice to Patrick GIBBONS at the Subject Premises.  The seizure notice stated in part:

> This is to notify you the U.S. Customs and Border Protection seized the property described below ((1pr) Nike Sneakers/(12pr) Nike Air Jordan Sneakers) at Port of Rochester, New York on January 12, 2019.  The property was seized in accordance with the provisions of Title 19 United States Section 1526(e) which prohibits the importation of merchandise bearing counterfeit trademark that is both registered with the Patent and Trademark Office and recorded with Customs and Border Protection. The property contains markings which are substantially indistinguishable from and therefore, bear counterfeit design/word/mark as indicated below.  Customs and Border Protection Regulations provide that any article imported into the United States bearing a counterfeit trademark shall be seized and, in the absence of written consent of the trademark owner, forfeited for violation of the Custom laws.

CBP sent an "Election of Proceedings Non CAFRA Form" to GIBBONS at the SUBJECT PREMISES, which provided 5 choices for proceeding following the seizure of the shipment.  The choices were as follows:

1. Petition for return of the property;

2. Offer a compromise;

3. Abandon the property;

4. Request a hearing in court; or

5. Have CBP begin administrative proceedings for forfeiture of the property.

CBP FPF did not receive a response from GIBBONS.

12.     Homeland Security Investigations (HSI) agents researched U.S. Customs and Border Protection databases regarding importations to the SUBJECT PREMISES.  It was determined that in the prior six months, over 100 shipments, including the December 31, 2018 shipment, were sent from China to the SUBJECT PREMISES.  According to CBP, the majority of those shipments were sent via U.S. Postal Service Express Mail (via China Post). All of the shipments were destined for the SUBJECT PREMISES and consigned to Patrick GIBBONS.  The shipments came from various locations in Singapore, Hong Kong and Guangzhou, China.   The majority of the shipments came from the same location in GUANGZHOU, CHINA.

13.     It was further determined that four separate international inbound shipments (1 DHL and 3 US Postal Service)—sent to GIBBONS from China—are being held by CBP for examination.  As of March 5, 2019, two of the US Postal Service shipments were examined and found to contain counterfeit Nike sneakers. The DHL shipment contained 1 pair of Adidas Yeezy sneakers which were also determined to be counterfeit and subsequently seized by CBP.   On March 13, 2019, an Adidas representative viewed photographs of the

Adidas Yeezy sneakers and determined that the shoes are counterfeit based on, among other things, an incorrect embroidery reproduction of the trademark and an invalid security label.

14.   On March 1, 2019, your affiant conducted law enforcement and public database research regarding Patrick GIBBONS and the SUBJECT PREMISES.  Research revealed that GIBBONS resides at the SUBJECT PREMISES.

## EVIDENCE, CONTRABAND, FRUITS & INSTRUMENTALITIES OF CRIME

15.   Based on your affiant's training and experience, as well as discussions with other law enforcement members, I know that:

a. It is common for individuals involved in financial crime, including trafficking in counterfeit and pirated goods, to maintain financial documents and records relating to both their personal and business affairs. These documents will show their acquisition, conversion, movement, secreting, transfer and disbursement of currency, currency equivalents, and illegal goods, including counterfeit and pirated goods. It is also common for such persons to maintain currency, checks, money orders, credit cards, credit card receipts, or other financial instruments which are the proceeds or facilitating property of the illegal activity. These documents, records and financial instruments are often retained for long periods of time in secure and accessible locations, including residences, businesses, vehicles, safe deposit boxes and storage facilities. Individuals involved in the sale of

8

counterfeit products also commonly engage in tax evasion and will maintain two sets of books, one recording all cash sales for their own information and one recording redacted cash sales figures.

b.  Financial documents and records used in trafficking counterfeit goods often include inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; supplier, customer and/or co-conspirator telephone number and address listings; customer records; contracts; Rolodex files; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; airline ticket receipts; records of money orders; bank accounts; and financial instruments.   All of the foregoing items and information constitute evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code 2320 (trafficking and attempting to traffic in counterfeit goods); Title 18, United States Code, Section 542 (Entry of goods by means of false statement); and Title 18, United States Code, Section 545 (Smuggling goods into the United States).

9

c. Individuals involved in financial crime, including trafficking in counterfeit goods, create such documents, records, and information by various means, including, but not limited to, computers, smart phones, tablets, printers, telex machines, facsimile machines, currency counting machines, pagers (digital display beepers), and telephones, telephone answering machines, and cameras.  These individuals also maintain such documents, records, and information in various forms, including, but not limited to, electrical, magnetic, photographic, and tangible form.  The warrant application therefore requests authorization to search for and seize all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on a desktop or laptop computer or an electronic or magnetic storage device, including hard drives, floppy diskettes, ZIP discs, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

10

d. Individuals involved in the purchase and distribution of counterfeit goods in large quantities are likely to store those goods in multiple locations. Specifically, individuals who do not operate a legitimate store front or possess an offsite storage facility will utilize both their main residence and any outbuildings including garages, sheds, and vehicles.

16.     Individuals involved in the sale of counterfeit products deal in large amounts of cash. Often this surplus cash is kept in the business, but sometimes it is also kept in the business owner's residence. Individuals involved in financial crime also often use various money laundering schemes to dispose of their criminal proceeds to facilitate their crimes. They frequently co-mingle legitimate funds in an attempt to conceal and disguise their sources of income and they sometimes use a "nominee" or "straw purchaser" to purchase assets.

**Searching of Computers and Related Media:**

17.     Your affiant has spoken with a certified Computer Forensics Agent from HSI. This Computer Forensics Agent has received specialized training in connection with searching through computers (and related equipment) for files/data, which may contain information related to the items/materials being sought by this search warrant.

18.     Based upon my consultations with the Computer Forensics Agent, I know that searching and seizing information from computer systems and other storage media (computers, PDAs, cell phones, MP3 Players, etc.) often requires agents to seize most or all

of the computer system or storage media to be searched later by a qualified computer forensic analyst in a laboratory or other controlled environment. This is true for the reasons set out below.

19.     Computer storage media is used to save copies of files and communications, while printers are used to make paper copies of same. Applications and associated data stored on the storage media are the means by which the computer can send, print and save such activity. Finally, password protected data and other security devices are often used to restrict access to or hide computer software, documentation or data. Each of these parts of the computer thus are integrated into the entire operation of a computer. To best evaluate the evidence contained within computers, all related computer equipment described above should be available to the Computer Forensics Agent.

20.     In addition to the need to have all of the components available when a search of the computer is undertaken, the search of the computer itself is a time consuming process. However, unlike the search of documentary files, computers store data in files, which cannot easily be reviewed. For instance, a single 100 gigabyte hard drive is the electronic equivalent of approximately 50,000,000 pages of double spaced text. Furthermore, software and individual files can be password protected; files may be secluded in hidden directories; files can be mislabeled or be labeled with names which are misleading; similarly, files which contain innocent appearing names (e.g., _Smith.ltr_) may actually be electronic commands to electronically self-destruct the data; files can also be deleted, but unlike documents which

are destroyed, the data from deleted electronic files often remain on the storage device until overwritten by the computer. For example, the computer's hard drive stores information in a series of sectors each of which contain a limited number of electronic bytes (usually 512); these sectors are generally grouped to form clusters. There are thousands or millions of such clusters on a hard drive. A file's clusters may be scattered throughout the drive (a portion of a memo could be at Cluster 103 while the next portion of the memo could be stored at Cluster 2057). For a non-deleted file, there are "pointers" which guide the computer in piecing the clusters together. For a file that has been deleted, the "pointers" have been removed. Thus, the forensic examination would include the piecing together of the associated clusters that made up the "deleted" file. Being aware of these pitfalls, the investigator/analyst must follow a potentially time consuming procedure to review the contents of the computer storage device so as to insure the integrity of the data and/or evidence. Even if a deleted file has been overwritten and no fragment remains, applications, which provide access to the Internet and operating systems, maintain records (or logs) of activity on the Internet for an indefinite period. Such logs are located in files not usually used and/or accessed by computer users. A single computer and related equipment could take many days to properly analyze.

21.     Accordingly, there is a reasonable need to remove the computers and computer related equipment to a forensic setting in order to properly conduct a thorough search of the contents. Such action will greatly diminish the intrusion of law enforcement into the premises and will ensure that evidence can be searched for without the risk of losing, destroying or missing the information/data for which there has been authorization to search.

13

WHEREFORE, it is respectfully submitted that probable cause exists to believe that violations of Title 18 United States Code, Section 2320 (Trafficking in Counterfeit Goods), Section 542 (Entry of Goods by Means of False Statement) and Section 545 (Smuggling Goods into the United States) have occurred and that property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this affidavit, are located at the SUBJECT PREMISES, as described in Attachment A.  As such, it is respectfully requested that the attached warrant be issued authorizing the search of the SUBJECT PREMISES.

William J. Aiello
Special Agent
Homeland Security Investigations

Subscribed and sworn before me
this _____ day of March 2019.

HON. JEREMIAH MCCARTHY
United States Magistrate Judge

14

## ATTACHMENT A
### DESCRIPTION OF LOCATIONS TO BE SEARCHED

- The entire property located at 25 Avery Avenue, Lackawanna, NY 14218, including the residential building, any outbuildings, and any appurtenances thereto. The residential building, as depicted below, is a single story, single family residence with white siding. The front of the residence has a small porch with a small roof. There are a set of small black numbers "25" located on siding above the blue mailbox. The blue mailbox is located to the left of the front door. The front door is white with a metal storm door on the outside. A long driveway is located to the left of the residence. The driveway leads to a small detached garage with white siding and a blue door.

- The detached garage with white siding and a blue door.

- The person of Patrick GIBBONS, and any vehicle located at the SUBJECT PREMISES that reasonably appears to be owned or operated by GIBBONS.



## ATTACHMENT B - DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

Items to be searched and seized are the evidence, fruits, instrumentalities, or contraband relating to violations of Title 18, United States Code, Sections 2320, 542, and 545, including the following:

**A.     RECORDS**

1.     Records, documents, and materials containing information of past and present criminal activity involving trafficking or conspiring to traffic counterfeit goods. The terms "records," "documents," and "materials," includes such items in all forms, including paper, photographic, mechanical, electronic, magnetic, and optical forms, or other coding forms on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed hard discs, external hard discs, removable hard discs, floppy diskettes, compact discs (CDs), digital video discs (DVDs), tapes, optical storage devices, laser discs, electronic notebooks, zip discs, printer buffers, smart cards, or other memory storage devices.

2.     Records, documents, and materials that relate to the business of trafficking in counterfeit goods, and that contain, constitute or concern inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier

services documents and receipts; real estate and storage facility lease and title documents; supplier, customer and/or co-conspirator telephone or fax number and address listings; customer records; contracts; Rolodex files; keys; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; and airline ticket receipts.

3.      Records, documents, and materials containing, constituting or concerning financial transactions, financial statements, and financial summaries; including bank statements; currency; other financial instruments; financial applications; wire transfer records; credit cards; credit card statements and records; ATM access cards; credit reports; social security cards; accounting records; money orders; checks; tax records; ledgers; and journals, relating to trafficking in counterfeit goods.

4.      Records, documents, and materials that relate to the businesses of trafficking in counterfeit goods and that contain, constitute or concern identification, foreign or domestic travel, or occupancy, residency, and ownership, such as driver's licenses; passports; visas; airline tickets; social security documents; mail; utility records; telephone records; and mortgages, deeds, and lien records.

## B.      HARDWARE

5.      Any and all computer hardware that reasonably appears to be in Patrick GIBBONS' actual or constructive possession, custody, or control. Computer hardware is

2

defined as that which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data related to trafficking in counterfeit goods.  Hardware includes any data-processing devices (such as central processing units, memory typewriters, Personal Data Assistants (PDAs), smart phones, tablets and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, and RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

## C.    SOFTWARE

6.    Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work, in whatever form it may be found, to include: electronic, magnetic, optical, or other digital form, in addition to printed source code, related to trafficking in counterfeit goods.  Software includes, but is not limited to: any programs to run operating systems, control peripheral equipment, applications, utilities, scripts, compilers, interpreters, and communications programs; any programs, whether functional or not, to assist in the defeat of security/protective features in place to prevent the unauthorized copying, distribution, and/or activation of software; along

with any and all programs necessary for the proper functioning of this software.

### D.   PASSWORDS, DATA SECURITY DEVICES & COMPUTER DOCUMENTATION

7.     Computer passwords and other data security devices that are designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.

8.     Data security software or digital codes may include programming code that creates "test" keys or "hot" keys, which perform user-defined security-related functions when activated.  Data security software or code which might also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data.  Computer passwords may be stored in electronic media or written down on ledgers, books, papers, etc.

9.     Computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items, related to trafficking in counterfeit goods.

4

### E.   COUNTERFEIT GOODS & RELATED EQUIPMENT, DEVICES & MATERIALS

9.     All counterfeit items such as sneakers, clothing or bags; any identifying containers, product literature, documentation or packaging; and any tools, equipment, devices or materials for use in the manufacture, preparation, creation, or distribution of merchandise bearing unauthorized use of registered trademarks.


10.    Any and all correspondence or notices from U.S. Customs and Border Protection, or any other governmental agency, regarding shipments of counterfeit, or suspected counterfeit, goods.


### F.   PROCEEDS

11.    Any and all U.S. Currency, foreign currency, money orders, and checks obtained as a result of the distribution of illicit merchandise containing trademarks in violation of the above offenses.